## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | § | |
|---|---|---|
| IN RE: | § | CASE NO: 21-10818 |
| | § | |
| RIVERSTREET VENTURES, LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | SECTION A |
| | § | |

## ORDER AND REASONS

On September 16, 2021, this Court held an evidentiary hearing to resolve the *Motion for Relief from the Automatic Stay*, as supplemented (the "Lift-Stay Motion"), [ECF Docs. 7 & 42], filed by Lion Financial, LLC ("Lion"), as well as the Opposition to the Lift-Stay Motion filed by Riverstreet Ventures, LLC ("Riverstreet" or, post-petition, the "Debtor"), [ECF Doc. 32].[1] After considering the pleadings, the exhibits introduced into evidence, the testimony and demeanor of the witnesses, the record, applicable law, and the arguments of counsel, this Court DENIES the Lift-Stay Motion.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(A), (G) & (O). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

---

[1] The Court held the evidentiary hearing virtually while the Court was temporarily reconstituted in the United States Bankruptcy Court for the Western District of Louisiana in Alexandria, Louisiana, due to the adverse effects of Hurricane Ida on the greater New Orleans area.

**FINDINGS OF FACT[2]**

### A. Procedural Background

The Debtor, a Louisiana limited liability company, filed for bankruptcy relief as a single asset real estate entity on June 23, 2021, under chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. The Debtor continues to operate its business as a debtor-in-possession. No proofs of claim have been filed, as it is early in the case and no bar date has been set; however, the Debtor listed approximately $6.2 million in unsecured debt against the estate, the vast majority of which is identified as unsecured loans received from individuals. [ECF Doc. 16]. The Debtor owns a 3.3-acre parcel of land located at 1321 Brooklyn Street in Algiers, Louisiana, across the Mississippi River from New Orleans (the "Property"). The Property is the former site of "Blaine Kern's Mardi Gras World," a tourist attraction and artists' workshop where many Mardi Gras floats were constructed over the years. At this time, the Property is a vacant lot with scattered concrete slabs on the site, but no structures. A week into the Debtor's bankruptcy case, Lion filed the Lift-Stay Motion, asserting that the automatic stay should be terminated for cause under § 362(d)(1) of the Bankruptcy Code or under § 362(d)(2) because the Debtor has no equity in the Property and the Property is not necessary to an effective reorganization. The Court continued the initial hearing on the Lift-Stay Motion at the parties' request to afford the parties time to conduct discovery. [ECF Doc. 38].

At the evidentiary hearing, the parties stipulated to the admission of the *Declaration of Ronald Simkins*, Lion's manager, and exhibits attached thereto evidencing (i) a *Promissory Note*

---

[2] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

dated May 31, 2016, issued in favor of Lion by Riverstreet in the principal amount of $3.5 million (the "Note"); (ii) the *Multiple Indebtedness Mortgage, Pledge of Leases and Rents and Security Agreement* (the "Mortgage"), dated May 31, 2016, granted by Riverstreet in favor of Lion to secure repayment of the Note; and (iii) the *UCC Financing Statement*, evidencing recordation of Lion's Mortgage. *See* Joint Ex. 1 & Ex. 1–3. The parties also stipulated to the admission of (i) a *Multiple Indebtedness Mortgage, Pledge of Leases and Rents and Security Agreement*, dated April 9, 2020, granted by Riverstreet in favor of JAM Trading, LLC, as security for a $200,000 loan, and a UCC Financing Statement, evidencing recordation of JAM Trading, LLC's mortgage, *see* Joint Exs. 5 & 6; and (ii) a recorded *Judgment* dated November 18, 2020, in favor of Mathes Brierre and against Riverstreet and another defendant in the amount of $600,000, *see* Joint Ex. 7. The Court heard expert testimony from Lion's appraiser, Thomas M. Hancock, Regional Director of Murphy Appraisal Services, and admitted into evidence his firm's appraisal. *See* Joint Ex. 1 & Ex. 4 (the "Murphy Appraisal"). The Court also heard testimony from the Debtor's principal, Philip Spiegelman, a real estate developer with over fifty years' experience, and expert testimony from the Debtor's appraiser, Brad E. Weinberg, Partner at Novogradac & Company LLP, and admitted into evidence three appraisals of the Property generated by his firm. For the purposes of the resolution of the Lift-Stay Motion only, the Debtor does not dispute the validity of Lion's Mortgage or the amount asserted by Lion in the Lift-Stay Motion to be owed under the Note, which, as of June 25, 2021, was $3,303,733.64. The parties dispute the value of the Property.

At the close of the evidence, the Court took the matter under submission.

**B. The Debtor's Development Plan**

Spiegelman testified that Riverstreet acquired the Property in June 2016 for $4.1 million, financing $3.5 million of the purchase price through Lion. Hr'g Min. 2:27:22. At that time, the

Property possessed a right of entitlement allowing the development of 167 multi-family apartments or units; however, in 2019, Riverstreet pursued and obtained approval from the New Orleans City Council for a development project that would have increased the density to over 300 units. Hr'g Min. 2:27:57. Spiegelman further testified that prior to the passage of a required zoning ordinance, a new City Council was seated and a new member of the Council blocked Riverstreet's zoning approval. Hr'g Tr. 2:28:42–2:29:34. Litigation ensued and, although Riverstreet won early victories, it ultimately lost on appeal. Hr'g Min. 2:29:52. Because the right of entitlement for 167 multi-family units remained, Riverstreet moved forward with developing the Property and obtained the appropriate permits. Hr'g Tr. 2:30:12–2:30:27. The project approved for development on the Property would include four newly constructed, seven-story mid-rise buildings overlooking the Mississippi River, New Orleans skyline, and the Crescent City Connection and containing 167 residential units, community areas, gyms, and a rooftop pool. Hr'g Min. 2:32:39; 2:35:49. Speigelman testified that Riverstreet had difficulty securing third-party financing while litigation over the actions of the New Orleans City Council dragged on, and by the time Riverstreet was ready to move forward with the 167-unit project, the COVID-19 health emergency took hold, resulting in emergency stay-at-home orders, an economic downturn, and a contraction in lending opportunities. Hr'g Min. 2:31:02–2:31:19. He testified that the Debtor's plan is to refinance its debt with Lion and move forward with the 167-unit project, but that no reorganization can happen without the Property, the Debtor's sole asset. Hr'g Tr. 2:31:29–2:34:14; 2:37:10. In Speigelman's words, there is "no project if there is no land." Hr'g Min. 2:35:01.

**CONCLUSIONS OF LAW**

"When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the Debtor." *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988). But a creditor can request the automatic stay be terminated or modified "for cause" or, as to the stay applied to actions against property, if the debtor does not have equity in the property and if the property "is not necessary to an effective reorganization." 11 U.S.C. § 362(d). "In stay relief litigation, § 362(g) of the Bankruptcy Code allocates the burden of proof by imposing upon the party opposing stay relief the burden of proof on all issues other than the existence of the debtor's equity in the collateral under § 362(d)(2)." *In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999) (citation omitted). "Ultimately a decision granting or denying a motion to lift [the] automatic stay pursuant to 11 U.S.C. § 362(d) is left to the discretion of the Bankruptcy Judge and decided on a case-by-case basis, and the decision may be overturned only upon a showing that the bankruptcy court abused its discretion." *HSH Nordbank AG v. Baytown Navigation, Inc. (In re Baytown Navigation, Inc.)*, No. H-12-36, 2012 WL 1123047, at *2 (S.D. Tex. Apr. 3, 2012) (citing *In re Fowler*, 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001)). The Court addresses Lion's arguments under § 362(d)(2) first.

A.     **Relief from Stay Pursuant to § 362(d)(2)**

"A secured creditor who seeks relief from the automatic stay under § 362(d)(2) has the burden to demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property." *In re Kowalsky*, 235 B.R. at 594 (citations omitted). "Once the movant establishes such a *prima facie* case, the

burden shifts to the debtor-respondent to show that the property is necessary for an effective reorganization." *Id.* (citation omitted).

"Under § 362(d), 'equity' means the difference between the value of the property and the total amount of claims that it secures." *In re Elmira Litho, Inc.*, 174 B.R. 892, 901 (Bankr. S.D.N.Y. 1994) (citations omitted); *see also Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 483, 524–26 (Bankr. E.D. Va. 2009) ("The [movants] have the burden of demonstrating lack of equity, which, for purposes of § 362(d)(2), requires a showing that the value of the collateral is less than the sum total of all of its liens."). The record indicates that the secured claims secured by the Property total $4,103,733.64, representing the secured claims asserted by Lion and JAM Trading, LLC, as well as Brierre's judgment lien.[3]

### 1. The Debtor holds equity in the Property

"While the Bankruptcy Code does not establish a specific method of valuation under Section 362(d)(1) [&] (2), an analogous provision under Section 506(a) provides some guidance on valuation issues." *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, at *7 (Bankr. M.D.N.C. Mar. 14, 2005) (citing *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 371–72 (stating that statutory construction is a "holistic endeavor" and defining the value of an "entity's interest in property" entitled to adequate protection under §§ 361 and 362 in light of the meaning of the value of the "creditor's interest" in property under § 506(a))). Section 506 of the Bankruptcy Code states that the value of a creditor's interest "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C.

---

[3] To be clear, for purposes of resolving the Lift-Stay Motion, the Debtor stipulated to the value and validity of Lion's secured claim, but nothing in this decision affects the Debtor's right to object to the secured claims asserted by Lion, JAM Trading, LLC, or Brierre going forward.

§ 506(a)(1); *see also Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997).

Focusing on the phrase "proposed disposition or use" of a creditor's collateral in § 506(a)(1), the United States Supreme Court in *Associates Commercial Corp. v. Rash* held that the appropriate standard courts should use to value collateral is the "replacement-value standard." 520 U.S. 953, 962 (1997). The Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id*. at 960.[4] "Section 506(a) calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed." *Id.* at 964. Further, in applying a replacement-value standard, the *Rash* Court left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." Id. at 965 n.6. "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id*. Nothing in *Rash* or the text of § 506(a)(1) requires the "proposed disposition or use" of collateral to be viewed from a debtor's perspective; however, the record here is limited on the creditor's side. Lion did not indicate in its papers and no representative testified at the evidentiary hearing regarding whether its intent is to liquidate the Property or keep the Property

---

[4]    The facts of *Rash* dealt with valuation determinations in the context of a chapter 13 plan confirmation; however, some bankruptcy courts have found the rationale in *Rash* to be helpful in valuing collateral for purposes of lift-stay motions in chapters 7 and 11. *See, e.g*., *In re Walck*, No. 11-37706, 2012 WL 2918492, at *2 (Bankr. D. Colo. July 17, 2012); *In re Pelham Enters., Inc*., 376 B.R. 684, 691–92 (Bankr. N.D. Ill. 2007). Indeed, "[p]ost-*Rash* case law suggests that *Rash* can be applied to the provisions of all three reorganization chapters—11, 12, and 13—because these chapters all treat secured claims similarly." *In re Motors Liquidation Co*., 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) (citing *In re Bell*, 304 B.R. 878, 880 n.1 (Bankr. N.D. Ind. 2003) and applying *Rash*'s "underlying thought process" to determine valuation method in the context of a § 363 sale); *see also In re Residential Capital, LLC*, 501 B.R. 549, 593–95 (Bankr. S.D.N.Y. 2013) (applying *Rash*'s ruling to adopt a going-concern valuation method to calculate an adequate protection claim based on diminution in value due to consensual use of collateral).

and develop it itself if the automatic stay were lifted. Spiegelman testified that the Debtor's plan in this bankruptcy case is to refinance its debt owed to Lion and move forward with the 167-multi-family-unit project, in line with the entitlements held by the Property. Hr'g Tr. 2:31:29–2:34:14.

Lion's appraiser, Thomas Hancock, submitted an appraisal valuing the Property at $940,000. *See* Murphy Appraisal, at 1. Hancock employed a sales-comparison approach to determine the "as is" market value of the property, assuming the "highest and best use" for the Property as a vacant lot to be commercial or mixed-use development. *See id*. at 4–5. Although the comparable sales he used were located in the same neighborhood as the Property, they were all used for commercial purposes or mixed-use purposes.[5] In his testimony, Hancock rejected any valuation that would have assumed 100% multi-family unit development as the proposed use of the Property. Hr'g Min. 59:01. Although the Court found Hancock to be an earnest and competent witness, the Court is not persuaded that § 506(a) allows this Court to apply his method here, as it does not consider this Property's "proposed disposition or use."

At the evidentiary hearing, the Debtor offered three appraisals of the Property, each applying different valuation methods. Those appraisals were obtained prepetition by a potential third-party lender of the Debtor. The first, dated January 12, 2021 ("Novogradac Appraisal 1"), employed a residual land analysis method, which calculates the Property's value after subtracting all costs and profit associated with a development project except for the land itself. The amount remaining is the residual land value, or the amount a developer would pay for the land, given an

---

[5]     Hancock's comparable sales possessed other characteristics that made them less helpful to the Court's analysis. For example, one commercial-use property had been purchased in a foreclosure sale and another's value was tied to its use in tandem with surrounding properties held by the same purchaser. *See* Murphy Appraisal, Addenda. But the primary deficiency in the Murphy Report is that it did not consider the value of the Property in light of its proposed disposition or use, as this Court is required to do under *Rash*.

assumed value of the development, costs, and profits. *See* Joint Ex. 2. Using development costs per unit provided by Novogradac's client for the development of the 167-unit project as well as development costs obtained for comparable properties in the area, the Novogradac Appraisal 1 valued the Property at a minimum of $8.3 million. *See* Joint Ex. 2, at 22. Weinberg testified that he considers the residual land analysis method used in Novogradac Appraisal 1 to be most appropriate because it is based on the intended purpose for the Property, which is the new-construction build-out of 167 multi-family units. Hr'g Min. 1:37:37.

Like the Murphy Appraisal, the second appraisal performed by Novogradac dated March 2, 2021 ("Novogradac Appraisal 2") employed a sales-comparison approach to determine the "as is" market value of the property. *See* Joint Ex. 3. The Novogradac Appraisal 2 utilized comparable sales of 100% multi-family unit developments, not sales of commercial or mixed-use properties like the Murphy Appraisal used. Weinberg testified that the sales-comparison approach is less optimal as a valuation method here because of the lack of sales of truly comparable properties to the subject Property in the Algiers area, *i.e*, new-construction, high-end multi-family units. Hr'g Min. 1:37:45. Weinberg observed that the proposed project on the Property was a "pioneering" endeavor in that neighborhood; therefore, he used sales of comparable multi-family properties in the downtown New Orleans area instead and then discounted for the Algiers location of the Property. Hr'g Min. 1:58:08; 2:16:14; 2:16:40. The Novogradac Appraisal 2 valued the Property at $5 million. Hr'g Min. 1:58:23. Lion questioned the 20% discount rate applied by Weinberg to account for the Property's location in the Algiers neighborhood, asserting that a higher discount rate should apply—perhaps as high as 56%—given that residents in Algiers may not have ready access to New Orleans' business district, restaurants, bars, and gyms. Hr'g Min. 28:58; 30:28; 1:11:55; 1:14:01.

The last appraisal provided by Novogradac dated March 26, 2021 ("Novogradac Appraisal 3") essentially combined the first two appraisal methodologies, significantly weighting its residual land analysis valuation, but tempering that valuation with the sales-comparison approach to reach a value for the Property of $8 million.  *See* Joint Ex. 4.  Weinberg testified that he used the same comparable sales as were used in the Novogradac Appraisal 2 to complete Novogradac Appraisal 3, that is, comparable sales of 100% multi-family unit developments.  Hr'g Tr. 1:59:56–2:02:19.  Weinberg also added that the Property has increased value due to its entitlements and the permits held by the Debtor to develop multi-family housing on the Property. Hr'g Min. 1:46:00.

In line with the statutory language of § 506(a) and judicial precedent, this Court values the Property in accordance with the Debtor's "disposition or use" of the Property, which is to develop the 167-unit multi-family housing project.  *See Rash*, 520 U.S. at 964; *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 799.  Although both appraisers have similar experience and credentials, as discussed above, the Court declines to rely upon the Murphy Appraisal because Hancock's selection of comparable properties is not in line with the Debtor's disposition and use of the Property.  *See In re SCC Kyle Partners, Ltd.*, No. 12-11978, 2013 WL 2903453, at *13 (Bankr. W.D. Tex. June 14, 2013) ("[Since] the selection of comparable properties and the adjustments to their sales price bear significantly upon the ultimate value established for a subject property, the comparable properties selected and the means of adjusting their sales price must be closely scrutinized." (citation omitted)).  The Court finds Weinberg to be a compelling, credible witness and affords considerable weight to his testimony.  Moreover, all of the Novogradac Appraisals considered the Debtor's use and disposition of the Property in valuing the Property.  After weighing and considering the evidence, the Court concludes that the residual land value approach

to valuation of this Property is more appropriate here due to the lack of comparable properties required for a sales-comparison approach to valuation of this Property. Thus, the Court finds the value of the Property for purposes of resolving the Lift-Stay Motion to be $8.3 million.

> 2. *The Court need not decide whether the Property is necessary for an effective reorganization*

For the purposes of resolving this Lift-Stay Motion, the Court has valued the Property at $8.3 million and the claims secured by the Property total $4,103,733.64; thus, the Court finds that the Debtor has equity in the Property. Because Lion has failed to meet its burden to show that there is no equity in the property, no need exists for the Debtor to prove that the Property is necessary for an effective reorganization. *See In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999). Therefore, the Court denies the relief requested pursuant to § 362(d)(2). *Id*. (citing *In re Keene Corp.*, 171 B.R. 180, 182 (Bankr. S.D.N.Y. 1994)).

**B. Relief from Stay Pursuant to § 362(d)(1)**

Section 362(d)(1) of the Bankruptcy Code requires this Court to terminate or modify the automatic stay upon a finding of "cause, including the lack of adequate protection of an interest in property of such party in interest." Although "cause" is not expressly defined in the Bankruptcy Code, "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir. 1986) (citations omitted). "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Id*. at 1072. This Court is instructed to consider the good faith of the Debtor's filing based on the totality of the

circumstances, requiring an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id.*

Citing *In re Little Creek Development Co.*, Lion asserts the stay should be lifted because the Debtor here has only one asset which is fully encumbered, no employees or cash flow, and foreclosure proceedings had been initiated prior to the Debtor's bankruptcy filing. *See* Lift-Stay Motion, ¶ 18. Often single-asset real estate ("SARE") cases by their very nature meet some of the *Little Creek* benchmarks of a bad-faith filing. But "[t]he fact that the Debtor is a SARE case is not by itself an indicia of a bad faith filing." *In re Costa Bonita Resort Inc.*, 479 B.R. 14, 41 (Bankr. D.P.R. 2012). Indeed, "[i]t is important to note that for SARE cases in particular, Section 362(d) was amended in 1994 to provide relief from the automatic stay to SARE cases if the debtor failed to make certain payments to a secured creditor or if a confirmable plan is not filed within a certain limited period." *Id*. at 40 (citing ALAN N. RESNICK & HENRY J. SOMMER, 7 COLLIER ON BANKRUPTCY ¶ 1112.07[6][ii] (16th ed. 2012) ("Recognizing both the potential for abuse as well as, implicitly, the potential legitimacy of certain cases in this context, Congress amended section 362 in 1994 to provide that, with respect to single asset cases involving real estate, relief from the automatic stay would be granted to the holder of a security interest in the asset if a confirmable plan is not filed within a relatively circumscribed period of time or the debtor fails to make certain payment to the secured creditor. The presence of the specific single asset real estate provisions strongly suggest that such cases are not per se filed in bad faith.").

Here, some of the *Little Creek* factors having been met, but others have not. This is not a two-party dispute; the Debtor has scheduled significant unsecured debt in this case. Lion and the Debtor have not proceeded to a stand-still in state court litigation and there are no allegations of wrongdoing by the Debtor or its principals. The Debtor is not a newly created entity designed to

12

isolate the Property and its creditors.  Further, although the deadline to file a plan or pay adequate

protection to secured lenders pursuant to § 362(d)(3) quickly approaches, it has not arrived yet.[6]

Therefore, the Court declines at this early stage in the case to find that the Debtor has filed its

bankruptcy case in bad faith and terminate the automatic stay on that ground.

## CONCLUSION

For the foregoing reasons, this Court DENIES Lion's Lift-Stay Motion.

New Orleans, Louisiana, September 20, 2021.

_____

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

[6]     Section 362(d)(3) provides that the Court shall grant relief from the automatic stay

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate . . . .

11 U.S.C. § 362(d)(3).