## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | Case No. 21-10818 |
| | § | |
| **Riverstreet Ventures, LLC** | § | Chapter 11 |
| | § | |
| Debtor | § | Section "A" |

### DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF OCTOBER 1, 2021

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE STATEMENT IS PROVISIONALLY APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN. ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## TABLE OF CONTENTS

**INTRODUCTION** .......................................................................................................... **4**

**I. PURPOSE AND SUMMARY OF THE PLAN** ....................................................... **4**

**II. SUMMARY OF CLASSIFICATION AND** ........................................................... **4**

**TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** ...................... **4**

   A. TREATMENT OF CLAIMS AND INTERESTS ........................................................ 4

   B. CLAIMS UNDER THE PLAN ................................................................................. 4

**III. GENERAL OVERVIEW AND BACKGROUND INFORMATION** ................... **7**

   A. BACKGROUND AND GENERAL INFORMATION ................................................... 7

      1.   OVERVIEW AND BACKGROUND OF THE DEBTOR ........................................ 7

      2.   ORGANIZATION AND CAPITAL STRUCTURE ................................................. 8

      3.   THE DEBTOR'S DEBT STRUCTURE ............................................................ 8

   C. EVENTS LEADING TO THE CHAPTER 11 CASE ................................................. 9

   D. SIGNIFICANT POST-PETITION EVENTS ............................................................ 9

      1. CONTINUATION OF BUSINESS; STAY OF LITIGATION. ................................ 9

      2. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT   RULES,

      AND U.S. TRUSTEE DEADLINES. ................................................................ 10

      3. RETENTION OF PROFESSIONALS ............................................................. 10

      4. MOTION FOR RELIEF FROM STAY ........................................................... 10

   A. VALUATION OF THE DEBTOR'S ASSETS ......................................................... 11

   B. FINANCIAL FORECAST OF THE DEBTOR ........................................................ 12

   C. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN ......................... 12

      1. ADMINISTRATIVE CLAIMS. ..................................................................... 12

   E. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN ................... 14

   F. OBJECTIONS TO CLAIMS/ADMINISTRATIVE CLAIMS/INTERESTS ................. 15

   G. CLAIMS AGAINST OTHERS ............................................................................. 16

**V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......... **16**

   A. REJECTION OF EXECUTORY CONTRACTS ....................................................... 16

   B. REJECTION CLAIMS ....................................................................................... 17

**VI. LITIGATION** ......................................................................................................... **17**

   A. PENDING LAWSUITS ....................................................................................... 17

**VIII. LIQUIDATION ANALYSIS UNDER CHAPTER 7** .......................................... **20**

**IX. CONFIRMATION PROCEDURE** ....................................................................... **22**

   A. VOTING AND OTHER PROCEDURES ................................................................ 22

   B. DISCLAIMERS AND ENDORSEMENTS .............................................................. 25

   C. THE CONFIRMATION HEARING ...................................................................... 25

   D. CONFIRMATION .............................................................................................. 26

   E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS ........................ 26

   G. BEST INTEREST TEST ..................................................................................... 28

   H. CERTAIN RISK FACTORS TO BE CONSIDERED ............................................... 29

   I. CERTAIN BANKRUPTCY CONSIDERATIONS .................................................... 29

**X. CONCLUSION AND RECOMMENDATION** ...................................................... **31**

**EXHIBITS TO DISCLOSURE STATEMENT**

Exhibit D-1 Chapter 11 Plan of Reorganization

Exhibit D-2 Novogradac Appraisal

Exhibit D-3 Bridge Loan Term Sheet

## INTRODUCTION

Riverstreet Ventures, LLC ("Debtor" or on and after the Effective Date of the Plan, the "Reorganized Debtor"), has filed a Plan of Reorganization dated October 1, 2021 (the "Plan"). The Plan is attached to this Disclosure Statement as **Exhibit D-1**. The Debtor submits this Disclosure Statement (this "Disclosure Statement"), pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtor, in connection with (i) the solicitation of acceptances or rejections of the Plan (together with any modification, amendment or supplement, of the Plan), and (ii) the hearings to consider approval of the Plan to be scheduled before the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court") on the date(s) set forth in the accompanying notice.

## I. PURPOSE AND SUMMARY OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY.

The primary purpose of the Plan is to reorganize the debts of the Debtor and make distributions to holders of Allowed Claims.

## II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A. TREATMENT OF CLAIMS AND INTERESTS

The Plan contemplates payments to all holders of Allowed Claims against the Debtor based upon the liquidation of certain assets and the cash flow created through the Debtor's' business operations.

### B. CLAIMS UNDER THE PLAN

The following is a summary of the classification and treatment of Claims under the Plan:

| CLASS | TREATMENT |
|---|---|
| **Unclassified. Allowed Administrative Expense Claims.**<br><br>Simon, Peragine, Smith & Redfearn, LLP is owed approximately $30,000.00 in attorneys fees. Additional fees and expenses will be incurred by The Derbes Law Firm, Debtor's' counsel, Middleburg Riddle Group, special counsel to the Debtor, and Novogradac Consulting, through the Effective Date.<br><br>Unimpaired. Not entitled to vote. | On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtor and such Holder shall have agreed upon in writing; p*rovided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).<br><br>Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be Filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such request shall include at a minimum (a) the name of the Holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim and (c) the basis for the Administrative Expense Claim. Failure to file and serve such request and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.<br><br>All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall File and serve on the Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.<br><br>Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it after the Petition Date and before the Effective Date arising in the ordinary course of the Debtor's' business shall not be required to file any request for payment of such Claims, but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Debtor or from the proceeds of the sale of the Debtor's property without any further action by the Holders of such Claims.<br><br>Estimated percentage recovery: 100% |
| **Unclassified: Allowed Priority Tax Claims.**<br><br>The total estimate of Allowed Priority Tax Claims is $0.<br><br>Unimpaired. Not entitled to vote. | Each Holder of an Allowed Priority Tax Claim against the Debtor shall be paid in full of the proceeds of the partial liquidation of the Debtor's assets pursuant to this Plan. Should the Allowed Priority Tax Claims not be paid in full within 180 calendar days following the Effective Date, the Debtor shall commence making monthly cash installments on the allowed Priority Tax Claims beginning on the Initial Distribution Date in such amounts as will allow the claims to be paid in full in monthly installments over, and within, five years from the Petition Date pursuant to 11 U.S.C. § 1129(a)(9)(C). Such monthly payments shall continue with each consecutive month thereafter until the earliest date on which the liquidation of the Debtor's assets allows Debtor to pay the remaining balance of the Allowed Priority Tax Claims in full in a lump sum or the Allowed Priority Tax Claims have been paid in full by such installments. Statutory interest shall be paid upon Allowed Priority Tax Claims pursuant to 11 U.S.C. § 511. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course |

| | |
|---|---|
| | of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full.<br><br>Estimated percentage recovery: 100% |
| **Class 1 – Lion Financial, LLC Secured Claim**<br><br>The total estimate of the Allowed Class 1 Claim is $3,303,500.00.<br><br>Unimpaired. Not entitled to vote. | The Secured Claim of Lion Financial, LLC will be refinanced by the Bridge Loan from Real Estate Commercial Lending, LLC on or prior to the Effective Date. The Bridge Loan shall be evidenced by the RECL Loan Documents and will be Secured by a first mortgage on the Property. RECL will maintain the same rank and to the same extent as the Lion Mortgage as of the Petition Date, to secure the payment of the terms of the Bridge Loan. The Class 1 claim is secured by a mortgage on the Debtor's real property. Lion Financial, LLC shall retain its lien on the Debtor's property until paid in full.<br><br>Estimated percentage recovery: 100% |
| **Class 2 – Jam Trading, LLC Secured Claim**<br><br>The total estimate of the Allowed Class 2 Claim is $200,000.00.<br><br>Impaired. Entitled to vote. | Jam Trading, LLC will be paid the principal portion of the Jam Secured Claim from the proceeds of the Bridge Loan, but the interest due upon the claim shall be paid at the rate of 6% from the Petition Date, rather than the rate of 12% for said period which would otherwise be due. Jam Trading shall retain its lien on the Debtor's property until all Class 2 claims are paid in full. The Class 2 claim is secured by a second mortgage on the Debtor's real property.<br><br>Estimated percentage recovery: 100% |
| **Class 3 – Mathes Brierre, A Professional Corporation**<br><br>The total estimate of the Class 3 Claim is $600,000.00.<br><br>Impaired. Entitled to Vote | The Secured Claim of Mathes Brierre, A Professional Corporation is secured by a third mortgage on the Debtor's real property. The Class 3 Claim shall be amortized over a period of twenty (20) years, with a balloon payment on the remaining balance due after ten (10) years, and repaid in principal and interest at the current Louisiana Judicial Interest rate of three and one half percent (3.5%) per annum. Monthly payments of principal and interest will commence 30 days after the Mathes Brierre Judgment becomes a final judgment, with payments continuing on the fifteenth (15th) day of each successive calendar month. The Debtor reserves the right to prepay all or any portion of this claim at any time without penalty. Mathes Brierre shall retain its lien and security interests until the Class 3 claim is paid in full.<br><br>If the Mathes Brierre Appeal results in a reduction of the Mathes Brierre Claim to $0, no payments will be due to Class 3 and the Mathes Brierre Lien shall be deemed null and void.<br><br>Mathes Brierre may elect to accept on the Effective Date the Mathes Brierre Settlement Payment in full and final satisfaction, compromise, settlement, release, and discharge of the Mathes Brierre Claim. Should Mathes Brierre elect this alternative treatment, the Debtor and Mathes Brierre will enter into the Mathes Brierre Settlement Agreement.<br><br>Estimated percentage recovery: 100% |
| **Class 4 – General Unsecured Claims**<br><br>The total estimate of Class 4 Claims is $15,000.<br><br>Unimpaired. Not entitled to Vote | Holders of Allowed Class 4 Claims will be paid a pro rata share of $15,000 in full on the Effective Date in full satisfaction of Claims.<br><br>Estimated percentage recovery: 100% |
| **Class 5 – Investor Claims**<br><br>The total estimate of the Class 5 Claims is $6,192,000.00. | Class 5 is comprised of Investors in the Debtor. Within 30 days of the Construction Loan Closing, except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in treatment of the Allowed Unsecured Investor Claims against the Debtor, each such Holder shall |

| | |
|---|---|
| Impaired. Entitled to vote. | receive its Class 5 Interest Payment from the proceeds of the Construction Loan. Holders of Allowed Class 5 Claims will also be issued seven and one-half percent (7.5%) of the membership interests of the Reorganized Debtor, to be computed pro rata on the allowed amounts of their respective claims. Ninety (90) days after the Construction Loan Closing, Holders of Allowed Class 5 Claims will begin receiving Class 5 Quarterly Interest Payments. Those payments shall terminate upon the issuance of a Certificate of Occupancy to the Reorganzied Debtor. Thirty (30) days after the issuance of the Certificate of Occupancy, the Reorganized Debtor will commence payments to Holders of Allowed Class 5 Claims pursuant to the Class 5 Payment Schedule.<br><br>Should the Debtor liquidate its assets, Class 5 claimants shall receive their pro rata share of the sale proceeds after all Administrative Claims, Priority Tax Claims, and Classes 1-4 have been paid in full. The Debtor reserves the right to prepay all or any portion of this claim at any time without penalty.<br><br>Estimated percentage recovery: 60% |
| **Class 6 – Equity Interests**<br><br>Impaired. Entitled to vote. | Within 30 days of the Construction Loan Closing, each such Holder shall receive its Class 5 Cash Interest Payment from the proceeds of the Construction Loan. Holders of Allowed Class 5 Claims will also be issued a pro rata share of seven and one-half percent (7.5%) of the membership interests of NEWCO, to be computed on the allowed amounts of their respective claims. Ninety (90) days after the Construction Loan Closing, Holders of Allowed Class 5 Claims will begin receiving Class 5 Quarterly Interest Payments. Those payments shall terminate upon the issuance of a Certificate of Occupancy to the NEWCO.<br><br>Should the assets of the Debtor be liquidated, Holders of Equity Interests shall not receive any distributions until all Administrative Claims, Priority Tax Claims, and Classes 1-5 have been paid in full. |

The Claims and Claim amounts listed above are amounts estimated by the Debtor as of the filing of this Disclosure Statement and all such Claims are still being reviewed by the Debtor. A listing of Claims or any amounts with respect thereto above or elsewhere in this Disclosure Statement shall not constitute, or be deemed to constitute, allowance of such Claims and all such Claims and amounts are subject, and will remain subject, to challenge and objection by the Debtor and the Reorganized Debtor prior to voting on the Plan and at any time thereafter as provided in the Plan.

### III. GENERAL OVERVIEW AND BACKGROUND INFORMATION

**A. BACKGROUND AND GENERAL INFORMATION**

**1. OVERVIEW AND BACKGROUND OF THE DEBTOR**

The Debtor is the owner of a real estate site located at 1321 Brooklyn Street in Algiers, Orleans Parish, Louisiana. The site is comprised of two separate parcels known as Square 217 and

Square 216 ("<u>Property</u>"). The combined parcels are approximately 3.3 acres and sit along the Mississippi River directly across from the New Orleans Central Business District. The Property will be used for a newly-constructed multifamily development that will offer four seven-story mid-rise buildings containing 167 residential units, community areas, and an outdoor amenity area ("Project").

The Debtor acquired the Property in 2016 from Blaine Kern as the Property originally contained warehouses utilized by Blaine Kern's Mardi Gras businesses. The Property has a right of entitlement for 167 multi-family apartments. In April, 2019, the Debtor sought and received approval from the New Orleans City Council for a project that would increase the density to over 300 units. Prior to the completion of the final language of the zoning ordinance for official adoption, a new City Council was seated and the new councilwoman orchestrated an effort to block adoption of the Debtor's zoning approval. The Debtor subsequently sued the City of New Orleans and won, but then was reversed on appeal. The Debtor no longer had the time or inclination to continue its pursuit of bonus density and decided to pursue only the of right entitlement of 167 units. The unit mix is projected as 66% one bedrooms and 34% two bedrooms.

## 2. ORGANIZATION AND CAPITAL STRUCTURE

Riverstreet Ventures, LLC is a Louisiana limited liability company domiciled in Metairie, Louisiana. MPC New Orleans, LLC, a Florida limited liability company, is the sole member of the Debtor. Philip J. Spiegelman is the manager of the Debtor and sole member of MPC New Orleans, LLC. Mr. Spiegelman has been active in the real estate industry since 1970, first as a developer and then as a leader and authority in sales and marketing. In 1994, he was a founder of International Sales Group in Miami, Florida, which has marketed and sold over $16 billion in prestige properties for leading developers.

## 3. THE DEBTOR'S DEBT STRUCTURE

The Debtor's Debt Structure is as follows:

Priority Tax Claims - None

Lion Financial, LLC Secured Claim - $3,303,733.64

Jam Trading, LLC Secured Claim– $190,000.00

Mathes Brierre Secured Claim - $600,000.00

General Unsecured Claims – $15,000.00

Investor Claims - $6,192,000.00

## C. Events Leading to the Chapter 11 Case

Due to the economic impacts of Covid-19, the Debtor was delayed in obtaining the financing needed to construct the Project.  As a result, the Debtor defaulted on its obligations to Lion Financial, LLC, in November 2020.  Lion Financial holds a first mortgage on the Property.  On January 15, 2021, Lion Financial, LLC commenced foreclosure on the Property by filing its *Verified Petition for Executory Process with the Benefit of Appraisal* in the Civil District Court for the Parish of Orleans.  A sale was ultimately scheduled for June 24, 2021. The Debtor filed its bankruptcy case on June 23, 2021.

## D. Significant Post-Petition Events

On June 23, 2021 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to manage its affairs as Debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### 1. Continuation of Business; Stay of Litigation.

Following the Petition Date, the Debtor has continued to operate as Debtor-in-possession with the protection of the Bankruptcy Court. The Bankruptcy Court has certain supervisory powers over the Debtor's operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of the Debtor's business. An

immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

### 2. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT RULES, AND U.S. TRUSTEE DEADLINES.

On July 8, 2021, the Debtor filed the Statement of Financial Affairs and the Schedule of Assets and Liabilities.  According to the Schedules, on the Petition Date the Debtor had assets totaling $5,002,000.00 and liabilities of $9,897,000.00.  On July 19, 2021, the first meeting of creditors was held. The Debtor is current on the filing of all monthly reports and payments of quarterly fees to the Office of the United States Trustee.

### 3. RETENTION OF PROFESSIONALS

On July 29, 2021, the Court approved the retention of Patrick S. Garrity and the lawfirm of Simon, Peragine, Smith & Redfearn, LLP as counsel for the Debtor.  On September 13, 2021, The Derbes Law Firm was substituted for Simon, Peragine, Smith & Redfearn, LLP.

The Debtor retained Middleburg Riddle Group on September 21, 2021 to serve as special counsel to the Debtor in the prosecution of an appeal of state court judgment obtained by Mathes Brierre.

Finally, the Debtor has requested authorization to employ Novagradac Consulting, LLC to provide litigation support and appraisal services.  The application is pending as of the date of this disclosure statement.

### 4. MOTION FOR RELIEF FROM STAY

On June 30, 2021, Lion Financial, LLC filed a Motion for Relief from the Automatic Stay ("Motion") [Dkt. #7].  An evidentiary hearing on the Motion was held on September 16, 2021.

After hearing testimony from appraisers for the Debtor and Lion, as well as Philip Spiegelman, the Court denied the Motion.  The value of the Debtor's real estate was determined to be $8,300,000.00.

## IV. THE PLAN

The Debtor have proposed the Plan and believe that the classification and treatment of Claims provided for in the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, holders of Allowed Claims against the Debtor that are impaired and that receive distributions under the Plan are entitled to vote on the Plan. A copy of the Plan accompanies this Disclosure Statement as **Exhibit D-1.** A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

The interest rates for the creditors set forth in the Plan are based upon federal law, Louisiana law and the current market rate for commercial loans.

### A. VALUATION OF THE DEBTOR'S ASSETS

The Debtor's primary asset is real property located at 1321 Brooklyn Street in Algiers, Orleans Parish, Louisiana. The Property will be used for a newly-constructed multifamily development that will offer four seven-story mid-rise buildings containing 167 residential units, community areas, and an outdoor amenity area.

The design of the project incorporates amenities on the larger of the two buildings of 98 units.  Those buildings will include an elevated pool deck affording clear views to the Mississippi River, Crescent City Connection, Central Business District, and the French Quarter, exercise facility with modern equipment, and bathroom facilities.  The facility also has a potential provision for small retail or community space at ground floor level.

The project is currently approved under "of right" zoning allowing for the development of 167 apartments.  Processing for permitting with the City of New Orleans is currently in process. In addition to the benefits that are inherent to the project, the Debtor has taken advantage of changes

to the EB-5[1] and Opportunity Zone (OZ) programs instituted in November 2019. The Property is approved for both programs under new boundary and demographic recalculations. The Debtor has engaged the proper consultants to structure and design the project for an EB-5 component.

The current value of the Property is $8,300,000.00. An appraisal of the Property prepared by Novogradac on January 12, 2021 ("Novogradac Appraisal") is attached as **Exhibit D-2**.

## B. FINANCIAL FORECAST OF THE DEBTOR

The financial forecast of the Debtor is based upon completion of the Project and the income projections contained in the Novogradac Appraisal. Projections of post-confirmation income and expenses, including an explanation of the assumptions used in preparation of the projections, are included in **Exhibit D-2**.

Only Class 5 claims are projected to be paid either through revenues from the Project or liquidation of the Property. All other creditors are to be paid through the Bridge Loan.

## C. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against the Debtor, including the treatment of Unclassified Claims. The principal Administrative Expense Claims known to the Debtor are the fees and expenses of the Debtor's former attorneys, Simon, Peragine, Smith & Redfearn, LLP, current attorneys The Derbes Law Firm, LLC, special counsel, Middleburg Riddle Group, and the Debtor's appraiser, Novogradac. The fees and expenses of Simon, Peragine, Smith & Redfearn, LLP are approximately $30,000.00. Additional fees and expenses will continue to be incurred through the Effective Date of the Plan. If the Property is liquidated, realtor commissions may become due.

### 1. ADMINISTRATIVE CLAIMS.

---

[1] The EB-5 Immigrant Investor Program was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors.

A.  ADMINISTRATIVE EXPENSE CLAIMS. On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtor and such holder shall have agreed upon in writing; p*rovided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).

B.  BAR DATE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS. Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such request shall include at a minimum (a) the name of the holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim and (c) the basis for the Administrative Expense Claim. Failure to file and serve such request and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.

C.  PROFESSIONAL COMPENSATION CLAIMS. All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall file and serve on the Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.

D.  ORDINARY COURSE LIABILITIES.  Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to

it after the Petition Date and before the Effective Date arising in the ordinary course of the Debtor's business shall not be required to file any request for payment of such Claims, but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Debtor or from the proceeds of the sale of the Property without any further action by the holders of such Claims.

**E. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

**1. EFFECTIVE DATE.**

The "Effective Date" of the Plan shall be the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect and shall be the earlier of the date that all Permits have been issued to the Debtor or one hundred eighty (180) days after the Confirmation Order becomes a Final Order.

*Effect of Failure of Conditions.* In the event that the Confirmation Order does not become a Final Order on or before 30 days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

**2. MEANS TO IMPLEMENT THE PLAN.**

On or prior to the Effective Date, the Debtor will obtain the Bridge Loan from RECL in the amount of $5,000,000.00. The Loan proceeds will be used to refinance the existing Lion Secured Claim, pay Classes 2, 4 and administrative claims, and pay for the completion of all architectural and engineering work needed to obtain necessary permits for construction. The Bridge Loan will be secured by a first mortgage on the Property and a personal guaranty by Philip Spiegelman. The

terms and conditions of the Bridge Loan are attached hereto as **Exhibit D-3**. The Debtor estimates that all permits will be issued before the expiration of one hundred eighty (180) days from the Confirmation Order becoming a Final Order.

New Equity Interests in Riverstreet shall be issued to Holders of Allowed Class 5 Claims and the Construction Lender, in consideration of (i) the prior contributions by Holders of Allowed Class 5 Claims, and (ii) the contribution of construction financing by the Construction Lender. The distribution of membership interests in NEWCO Holdings will be fifty percent (50%) to the Construction Lender, forty-two- and one-half percent (42.5%) to Monogram Marketing, LLC, and seven and one half percent (7.5%) to Holders of Allowed Class 5 Claims. As of and on the Effective Date and after the completion of the Restructuring Transactions, NEWCO Holdings shall own 100% of Reorganized Riverstreet. The Reorganized Debtor reserves the right to either form a new entity or operate the existing Riverstreet Ventures, LLC as NEWCO.

The Reorganized Debtor shall act as initial disbursing agent under the Plan and make all distributions required under the Plan.

**F. OBJECTIONS TO CLAIMS/ADMINISTRATIVE CLAIMS/INTERESTS**

**1. OBJECTIONS TO CLAIMS; PROSECUTION OF DISPUTED CLAIMS.**

The Debtor and the Reorganized Debtor have the responsibility and authority for administering, disputing, objecting to, compromising and settling or otherwise resolving and finalizing Distributions (if any) with respect to all Claims.

**2. ESTIMATION OF DISPUTED CLAIMS.**

The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim.

**3. NO DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS.**

If a Claim or any portion of a Claim is disputed, no payment or distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such disputed Claim or portion thereof becomes an Allowed Claim.

## G. CLAIMS AGAINST OTHERS

The Debtor is a party to the case *Mathes Brierre v. Karlton/ISG Enterprises, LLC and Riverstreet Ventures, LLC.* This case is an appeal of a judgment obtained against the Debtor that is currently pending at the Louisiana Fourth Circuit Court of Appeals. The Reorganized Debtor is retaining the rights to prosecute this claim.

While the Debtor is not aware of any other claims against third-parties, the Debtor shall retain and may enforce, and shall have the sole right to enforce, any other claims, demands, rights and Causes of Action that the Debtor or its Estate may hold against any Entity. The Reorganized Debtor or their successor may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor, or its successor. Further, the Reorganized Debtor, as the case may be, retain their rights to file and pursue, and shall have the sole right to file and pursue any adversary proceedings against any account related to debt balances owed to the Debtor, including avoidance actions arising under Sections 544-551 of the Bankruptcy Code. Notwithstanding the above, the Debtor does not anticipate bringing any Avoidance Actions or other actions after entry of the Confirmation Order.

## V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. REJECTION OF EXECUTORY CONTRACTS

Except as otherwise provided herein or pursuant to the Confirmation Order, as of the Effective Date, any unexpired leases between the Debtor and any person or Entity shall be rejected pursuant to section 365(a) of the Bankruptcy Code, except for any executory contract or unexpired lease that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior

to the Effective Date.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases provided for herein.

## B. REJECTION CLAIMS

If the rejection of an executory contract or unexpired lease by the Debtor (pursuant to the Plan or otherwise) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor and the Reorganized Debtor unless a Proof of Claim is filed and served upon counsel for the Debtor no later than thirty (30) days after the earlier of (i) entry of the Confirmation Order, or (ii) entry of an order approving such rejection. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated, to the extent they are Allowed Claims, as Allowed Class 4 Claims.

## VI. LITIGATION

### A. PENDING LAWSUITS

The Debtor was a party to two lawsuits prior to the filing of this case, which have been stayed by the Debtor's bankruptcy filing.  Those cases are as follows:

a.  *Mathes Brierre v. Karlton/ISG Enterprises, LLC and Riverstreet Ventures, LLC*

An appeal of a judgment obtained against the Debtor is currently pending at the Louisiana Fourth Circuit Court of Appeals.  On August 3, 2018, Mathes Brierre filed a Petition (the "Petition") against Karlton/ISG Enterprises, LLC ("Karlton/ISG") and Riverstreet in Civil District Court for the Parish of Orleans, State of Louisiana. In earlier litigation, Mathes Brierre sued Karlton/ISG for unpaid fees for architectural services. On September 26, 2018, a judgment in favor of Mathes Brierre against Karlton/ISG was granted in the amount of $944,669.23 (the "Karlton/ISG Judgment").

In the Petition, Mathes Brierre sought revocation of a release of a promissory note and mortgage by Karlton/ISG (the "Release") in favor of an alleged third-party debtor. As for

Riverstreet, Mathes Brierre sought to recover Six Hundred Thousand and No/100 Dollars ($600,000.00) from Riverstreet under a theory that Mathes Brierre was unjustly enriched by the Release.

Mathes Brierre filed a Motion for Summary Judgment against both Karlton/ISG and Riverstreet, which was heard on November 18, 2020. On January 21, 2021, Judge Rachael Johnson issued her judgment granting summary judgment against Riverstreet, awarding damages against Riverstreet in the amount of $600,000.00. In the judgment, the Court found that Mathes Breirre "established all elements applicable to its cause of action for unjust enrichment against Riverstreet."

Riverstreet subsequently filed a Motion for New Trial as to the judgment (the "Motion for New Trial"), arguing that Louisiana law requires a plaintiff establish five (5) elements in order to find a claim for unjust enrichment. One of the elements is that the plaintiff have no other remedy at law available to it. Based on several Louisiana cases, Riverstreet alleged that Mathes Brierre does have another remedy at law available to collect money – the enforcement against Karlton/ISG of the Karlton/ISG Judgment. Thus, granting summary judgment against Riverstreet for unjust enrichment was improper.

Prior to the hearing date for the Motion for New Trial, Judge Johnson (who had also presided over the prior litigation which resulted in the Karlton/ISG Judgment) recused herself from the case. In her recusal, Judge Johnson stated that she recently discovered that a scholarship foundation on which she served on the Board of Directors was involved in litigation with one of the parties (although the party is not stated, it is presumed to be Mathes Brierre). The case was reassigned to Judge Robin Giarrusso.

At the hearing on the Motion for New Trial, Judge Giarrusso verbally stated that the issues raised by Riverstreet in its Motion for New Trial were better handled on appeal. Additionally, Judge Giarrusso verbally stated that she would not grant a Motion for New Trial which involved a trial or

motion over which she did not preside. Thus, the Motion for New Trial was denied. Riverstreet subsequently filed a Motion for Devolutive Appeal, which was granted on September 21, 2021.  The Court of Appeals has not issued a scheduling order.

b.   *Lion Financial, LLC v. River Street Ventures, LLC*, Civil Action No. 2021-00464.; Civil District Court, Orleans Parish, Louisiana.

Lion Financial initiated a foreclosure proceeding against the Debtor on January 15, 2021. That matter was stayed by the Chapter 11 filing.

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain U.S. holders of Claims and Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section.  Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent.  The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX

ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

The Debtor is a conduit entity and, as such, pays no taxes. The plan treatment of the Debtor's assets generates a potential tax event for the equity holders of the Debtor. The tax event can be a gain or loss depending on the equity owner's basis in the Membership and the gain or loss can either be a capital gain or ordinary income depending on the individual's treatment of the investment in the Debtor.

### VIII. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The following Chapter 7 liquidation analysis ("Analysis") presents the estimated net value of the Assets of the Debtor, assuming that the Debtor's assets are liquidated under the provisions of Chapter 7 of the United States Bankruptcy Code, and that the net proceeds from the liquidation of the Debtor's assets are applied among the creditors of the Debtor's estate.  The Analysis indicates

the estimated values that might be obtained by classes of claims if the Debtor's assets were liquidated pursuant to a Chapter 7 liquidation, as an alternative to the Plan. Based on this Analysis, unsecured creditors would not be paid in full. Accordingly, liquidation under Chapter 7 would not produce greater value for distribution to creditors than that recoverable under the Plan.

Underlying the Analysis is a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor or a Chapter 7 trustee. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation value of the Debtor's assets will result in an accurate estimate of the proceeds that would be realized should the Debtor undergo actual liquidation. The actual amounts of claims against the estate could vary significantly from the Debtor's estimates depending on the claims asserted during the pendency of the bankruptcy proceedings and the outcomes of the Debtor's claims objections. The Analysis does not include the effect of any federal or state income tax liabilities that may arise as a result of the conversion of the case, if any. The Analysis also does not include liabilities that may arise as a result of lease or contract rejections, litigation, ad valorem tax assessments, or other potential claims unless expressly disclosed herein. A chart reflecting the hypothetical distribution in a Chapter 7 case based on a liquidation of the Debtor' assets is set forth below:

## HYPOTHETICAL DISTRIBUTION UNDER CHAPTER 7

| | Claims | Estimated Distribution | Balance |
|---|---|---|---|
| ASSETS | | | |
| Real Property | | | $8,300,000.00 |
| Cash | | | $2,000.00 |
| Total | | | $8,302,000.00 |
| | | | |
| LESS | | | |
| | | | $8,302,000.00 |
| Realtor Fees (5%) | $415,100.00 | ($415,100.00) | $7,886,900.00 |
| Chapter 11 Admin Claims | $150,000.00 | ($150,000.00) | $7,736,900.00 |
| Priority Tax Claims | $0 | 0 | $7,736,900.00 |

| Class 1 | $3,303,733.64 | ($3,303,733.64) | $4,433,150.00 |
| Class 2 | $200,000.00 | ($200,000.00) | $4,233,150.00 |
| Class 3 | $614,000.00 | ($614,000.00) | $3,619,150.00 |
| Chapter 7 Trustee Fees | $112,824.50 | ($112,824.50) | $3,506,325.00 |
| Class 4 | $6,207,000.00 | ($3,506,325.50) | $0 |

## IX. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. VOTING AND OTHER PROCEDURES

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim or interest in Classes 1 through 6 shall be entitled to vote to accept or reject the Plan. Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests in classes that are impaired under the terms and provisions of a chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims and interests will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims or interests are unimpaired under a Chapter 11 plan, are deemed to have accepted the plan and not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) Claims, as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and (ii) Interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of ownership shares of the common stock of a debtor.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an impaired Class (i) whose Claim has been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder of an Allowed Claim entitled to vote may vote whether to accept or reject the Debtor's Plan. A ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a ballot or ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your ballot to The Derbes Law Firm, LLC as follows, whether by U.S. mail, or by hand delivery or courier service:

The Derbes Law Firm, LLC
Attn: Patrick S. Garrity
3027 Ridgelake Dr.
Metairie, LA 70002

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS RETURNED TO SIMON, PERAGINE, SMITH & REDFEARN, LLP BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Ballots must be *received* by The Derbes Law Firm, LLC by the Voting Deadline.** If a ballot is received after the voting deadline established by the Court, it will not be counted.  Complete the ballot by providing all the information requested, and sign, date and return the ballot by mail, overnight courier or personal delivery to The Derbes Law Firm, LLC at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.  ANY OBJECTIONS TO THE CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone Patrick S. Garrity at the following telephone number: **1-504-837-1230**.

## B. DISCLAIMERS AND ENDORSEMENTS

This Disclosure Statement contains information about the Debtor's Plan. Holders of Claims are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to creditors or Claims in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C. THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan. The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable **Meredith S. Grabill**, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Louisiana, on _____. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court and served so that they are received by the Bankruptcy Court, and the following counsel, on or before the date and time set forth in the accompanying notice:

Counsel to the Debtor:

The Derbes Law Firm, LLC
Patrick S. Garrity
3027 Ridgelake Dr.
Metairie, LA 70002
Telephone: (504) 837-1230
Facsimile: (504) 684-5507

## D. CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired Classes of Claims or, if rejected by an impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

## E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed. If a class of claims or interests rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor (a) requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, Unsecured Claims and Interests that do not accept the plan, as follows:

1. SECURED CREDITORS

Either (a) each Impaired secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the secured creditor's collateral, (b) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

2. UNSECURED CREDITORS

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a chapter 7 case.

3. NO UNFAIR DISCRIMINATION

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the "unfair discrimination" determination depends upon the particular facts of a case and the nature of the

claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the Debtor of equal or junior status.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor believes that the treatment of all Classes of Claims under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code. With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims in such Class.

## F. FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the Debtor is provided for in the plan. The Debtor believes the Plan is feasible and has attached hereto a pro forma forecast of operations to illustrate feasibility.

## G. BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors and equity security holders impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or

interest holder would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor requests confirmation of the Plan over the rejection of any Classes. In so doing, the Debtor seeks to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believes that the Plan provides to each holder of a Claim and Interest holder a value at least equal to the value of the distribution that each holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

## H. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

The major risk factor is that the Debtor will be unable to obtain the necessary financing to complete construction of its multi-family development.  This can occur in the event of unforeseen natural or market events that would damage the property and reduce its value.

## I. CERTAIN BANKRUPTCY CONSIDERATIONS

### 1. RISK OF LIQUIDATION OF THE DEBTOR'S ESTATE

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 case will continue as a chapter 11 case rather than be converted to liquidation. If a Chapter 7 liquidation were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated. In a liquidation under chapter 7, additional administrative claims will be incurred and could impact distributions to certain creditors. As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims, as compared to liquidation under Chapter 7.

2. RISK OF NON-OCCURRENCE OF THE EFFECTIVE DATE

The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events. There can be no assurance that all of these events will occur or that those that do not occur will be waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

3. UNCERTAINTY REGARDING OBJECTIONS TO CLAIMS

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date. A creditor may not know that its Claim will be objected to until after the Effective Date.

4. PERFORMANCE OF OBLIGATIONS BY THE DEBTOR UNDER THE PLAN

The Debtor's ability to make the payments and distributions required under the Plan depends upon selling certain real property and adequate income in the future that generates sufficient available cash flow to pay all operational expenses and to make the payments and distributions required under the Plan. Despite the pro forma projections of the Debtor, which it believes accurately predicts that such cash flow will be available, there can be no assurance that these forward-looking statements will ultimately be correct.

## X. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative because the Plan provides the best alternative for resolving the Debtor's financial problems.  Any other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and significantly lower distributions to creditors.  The Debtor urges holders of Impaired Claims to vote in favor of the Plan.

Dated: October 1, 2021

DISCLOSURE STATEMENT FILED BY:

*/s/ Patrick S. Garrity*
PATRICK S. GARRITY (#23744)
ALBERT J. DERBES, IV (#20164)
THE DERBES LAW FIRM, LLC
3027 Ridgelake Drive
Metairie, LA 70002
Telephone: (504) 207-0920
Email: pgarrity@derbeslaw.com
*Attorneys for the Debtor*

## Definitions

1. **"Administrative Expense Claim"** means any right to payment constituting a cost or expense of administration of the Bankruptcy Cases allowed under and in accordance with, as applicable, Sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Bankruptcy Estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Bankruptcy Cases, and (d) any compensation for professional services rendered and reimbursement of expenses incurred, including, without limitation, any fees or charges assessed against the Bankruptcy Estates pursuant to 28 U.S.C. § 1930.

2. **"Administrative Expense Claim Bar Date"** means the date which is thirty (30) days after the Confirmation Date.

3. **"Allowed"** means, with reference to any Claim against the Debtors, (a) any Claim against any of the Debtors that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed or no timely objection to allowance or request for estimation has been interposed; (b) any timely filed proof of claim either (i) as to which no objection has been or is interposed by the General Bar Date or Government Bar Date, as applicable, or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder of such Claim; (c) any Claim expressly allowed by a Final Order or under this Plan; or (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claim."

4. **"Avoidance Actions"** means all causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Reorganized Debtors, arising under chapter 5 of the Bankruptcy Code, including avoidable transfers under Sections 547 and 549 of the Bankruptcy Code ("Preferential Transfers"), and fraudulent transfers under 11 U.S.C. § 548 and applicable state law (including fraudulent transfers or fraudulent conveyances, collectively, "Fraudulent Transfers") and Section 544 of the Bankruptcy Code, or under any related state or federal statutes or common law, regardless whether such action has been commenced prior to the Effective Date.

5. **"Ballot"** means the form distributed to each Holder of an impaired Claim that is entitled to vote to accept or reject this Plan on which is to be indicated acceptance or rejection of this Plan.

6. **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Cases.

7. **"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the Eastern District of Louisiana, exercising jurisdiction over these Bankruptcy Cases and all adversary

proceedings and contested matters therein, or any other court of the United States having jurisdiction over these Bankruptcy Cases.

8.  **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075, as amended from time to time, as applicable to the Bankruptcy Cases, and any Local Rules of Bankruptcy Court.

9.  **"Bridge Loan"** means that certain post-petition financing/loan from Real Estate Commercial Lending, LLC in the principal balance of $5,000,000.00.

10. **"Bridge Loan Collateral"** means the Collateral securing payment of the Bridge Loan.

11. **"Bridge Loan Documents"** means any and all promissory notes, security and collateral agreements, loan agreements, deeds of trust, mortgages, UCC financing statements, acts of personal guaranty evidencing, describing, giving rise to or securing payment of the Bridge Loan.

12. **"Business Day"** means any day other than a Saturday, Sunday, or any other day on which banking institutions in New York City, New York are required or authorized to close by law or executive order.

13. **"Cash"** means legal tender of the United States of America.

14. **"Cause of Action"** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims or causes of action whatsoever, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date. Causes of Action includes Avoidance Actions.

15. **"Chapter 11"** means Chapter 11 of the Bankruptcy Code.

16. **"Claim"** has the meaning set forth in Section 101(5) of the Bankruptcy Code.

17. **"Claimant"** means the Holder of any Claim.

18. **"Claims Register"** means the list of claims maintained by the Clerk of the Bankruptcy Court listing all Claims filed in the Bankruptcy Cases.

19. **"Class"** means the group or category of Holders of Claims or Existing Equity Interests which are classified by this Plan pursuant to Section 1122 of the Bankruptcy Code or pursuant to an order of the Bankruptcy Court.

20. **"Class 5 Cash Interest Payment"** means the payment of simple interest at the rate of five percent (5%) per annum accrued on the principal balance of Allowed Class 5 Claims from the day the Confirmation Order becomes a Final Order through the Construction Loan Closing.

21. **"Class 5 Quarterly Interest Payment"** means the payment of simple interest at the rate of five percent (5%) per annum accrued on the principal balance of Allowed Class 5 Claims from the Construction Loan Closing until issuance of a Certificate of Occupancy.

22. **"Collateral"** means any property or interest in property of the Bankruptcy Estate of the Debtor subject to a valid and properly perfected Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law; and (ii) any acts of guaranty of payment of such Claim.

23. **"Confirmation"** means the determination of the Bankruptcy Court, evidenced by the Confirmation Order, to confirm this Plan.

24. **"Confirmation Date"** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

25. **"Confirmation Hearing"** means the hearing conducted by the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

26. **"Confirmation Order"** means the order or orders of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

27. **"Construction Lender"** means the entity that will fund the post-Effective Date loan to finance the construction of the Debtor's Multi-family Development.

28. **"Construction Loan"** means that certain post-confirmation financing/loan made to finance the construction of the Debtor's Multi-family Development.

29. **"Construction Loan Closing"** means that date that the Construction Loan is funded.

30. **"Construction Loan Collateral"** means the Collateral securing payment of the Construction Loan.

31. **"Construction Loan Documents"** means any and all promissory notes, security and collateral agreements, loan agreements, deeds of trust, mortgages, UCC financing statements, acts of personal guaranty evidencing, describing, giving rise to or securing payment of the Bridge Loan.

32. **"Contingent Claim"** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, any event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the Debtors now or hereafter exists or previously existed.

33. **"Covered Parties"** shall mean all of the present attorneys and professionals of any of the Debtors whose retention has been approved by the Bankruptcy Court, before or after the

Petition Date up to and including the Effective Date. For the avoidance of doubt, the term "Covered Parties" shall not include any of the Insider Parties.

34. **"Creditor"** has the meaning as set forth in Section 101(10) of the Bankruptcy Code and is the Holder of one or more Claims.

35. **"Cure Amount Claim"** means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code. Allowed Rejection Claims are classified and shall be treated as an Unsecured Claim in the Bankruptcy Case in which the Claim arose.

36. **"Cure Amount Claim Bar Date"** means the later of (i) the Effective Date or (ii) ten (10) days after the receipt of the notice of the amendment of Schedule 11.1 of this Plan.

37. **"Debt"** means liability on a Claim.

38. **"Debtor"** or **"Riverstreet"** means Riverstreet Ventures, LLC.

39. **"Disbursing Agent"** means the Entity or Entities, which shall initially be the Reorganized Debtor, to serve in such role, to distribute all or any portion of the Plan Distributions.

40. **"Disclosure Statement"** means the Disclosure Statement accompanying this Plan, including, without limitation, all exhibits, schedules and attachments thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

41. **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan.

42. **"Disputed"** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under this Plan or a Final Order nor deemed Allowed under Sections 502, 503 or 1111 of the Bankruptcy Code; (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order; or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order. Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered Disputed to the extent that the amount of the Claim specified in a proof of claim exceeds the amount of the Claim scheduled by the Debtors as not disputed, contingent or unliquidated (but only to the extent of such excess portion).

43. **"Disputed Claim Amount"** means the amount set forth in the proof of claim or Schedules relating to a Claim that is Disputed or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Claim that is Disputed in accordance with Section 502(a) of the

Bankruptcy Code and Bankruptcy Rule 3018.

44. **"Distribution"** means any distribution to the various Classes pursuant to the terms of this Plan.

45. **"Distribution Record Date"** means the Effective Date.

46. **"Effective Date"** or **"Effective Date of this Plan"** means the date that is the first Business Day after the conditions to the effectiveness of this Plan specified in Article XI hereof have been satisfied or waived.

47. **"Entity"** has the meaning set forth in Section 101(15) of the Bankruptcy Code.

48. **"Estate"** means the bankruptcy estate of the Debtor in this case pursuant to Section 541 of the Bankruptcy Code.

49. **"Existing Equity Interest"** means, without duplication, all membership interests of and in the Debtor, issued and outstanding immediately prior to the Effective Date, including, but not limited to, (a) all unexercised incentive stock or membership interest options, non-qualified stock or membership interest options, and stock or membership interest appreciation rights granted under any sponsored stock or membership interest option plans, (b) any other unexercised options, warrants, or rights, contractual or otherwise, if any, to acquire or receive an Equity Interest existing immediately before the Effective Date, and (c) all interests in the Debtor issued and held in treasury as of immediately before the Effective Date.

50. **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reserved, vacated or stayed and as to which (a) the time to appeal or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, re-argument or rehearing shall then be pending; or (b) if an appeal, new trial, re-argument or rehearing thereof has been sought and a stay has been granted or a bond has been posted pursuant to applicable law, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, or move for a new trial, re-argument or rehearing shall have expired.

51. **"General Bar Date"** means November 8, 2021, fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c)(3), is the deadline by which all Persons asserting Claims against the Debtors (other than Administrative Expense Claims) are required to file proofs of claim or be forever barred from asserting such Claims against the Debtor or their property and from voting on this Plan and/or sharing in any distributions hereunder.

52. **"General Unsecured Claim"** means any Claim for which no property of the Debtors or the Bankruptcy Estates serves as security or collateral. It also consists of the Claims for unsecured debts, liabilities, and demands or any character whatsoever owed by the Debtor, including, without limitation, all Claims noted on the Schedules filed herein, all amendments hereto, and all Claims by Persons having actual and/or constructive notice or knowledge of these Bankruptcy Cases.

53. **"General Unsecured Creditor"** means the Holder of a General Unsecured Claim against the Debtor.

54. **"Government Bar Date"** means December 20, 2021, fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c)(3), is the deadline by which all Governmental Units asserting Claims against the Debtor (other than Administrative Expense Claims) are required to file proofs of claim or be forever barred from asserting such Claims against the Debtors or their property and from voting on this Plan and/or sharing in any distributions hereunder.

55. **"Government Unit"** has the meaning set forth in Section 101(27) of the Bankruptcy Code.

56. **"Holder"** means the holder, as of the Distribution Record Date, of any Claim, including without limitation any one or more of Administrative Expense Claims, Priority Claims, or General Unsecured Claims.

57. **"Impaired"** means with respect to any Class of Claims or Existing Equity Interests under this Plan in which this Plan has altered the legal, equitable, and contractual rights of such Claims or Existing Equity Interests, and a Claim is Impaired unless it meets one of the exceptions specified in Section 1124 of the Bankruptcy Code.

58. **"Insider"** shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

59. **"Insider Claims"** means any Administrative Claims, Secured Claims or General Unsecured Claims held by any Insider.

60. **"Insider Parties"** means any Insider together with each of their respective present or former shareholders, members, officers, directors, managers, employees, successors, assigns, heirs, agents, advisors, attorneys, insiders, and professionals (each an Insider Party).

61. **"Investor"** means a General Unsecured Creditor whose claim is evidenced by a promissory note payable by Riverstreet Ventures, LLC and identified in Schedule 4.1.

62. **"Investor Claims"** means the General Unsecured Claims of Investors.

63. **"IRC"** means the Internal Revenue Code of 1986, as amended.

64. **"Jam"** shall mean Jam Trading, LLC.

65. **"Lien"** has the meaning set forth in Section 101(37) of the Bankruptcy Code.

66. **"Lion"** shall mean Lion Financial, LLC.

67. **"Mathes Brierre"** means Mathes Brierre, A Professional Corporation.

68. **"Mathes Brierre Appeal"** means the Debtor's appeal of the Mathes Brierre Judgment pending in the Louisiana Fourth Circuit Court of Appeals.

69. **"Mathes Brierre Claim"** means the claim of Mathes Brierre.

70. **"Mathes Brierre Judgment"** means the judgment obtained by Mathes Brierre against the Debtor on January 21, 2021, in the amount of $600,000.00.

71. **"Mathes Brierre Lien"** means the judicial mortgage of Mathes Brierre secured by the Debtor's real property.

72. **"Mathes Brierre Settlement Agreement"** means the agreement between the Debtor and Mathes Brierre dismissing all claims related to the Mathes Brierre Judgment and the Mathes Brierre Appeal.

73. **"Mathes Brierre Settlement Payment"** means the sum of $50,000.00.

74. **"Net Sales Proceeds"** mean gross sales proceeds less the costs and expenses associated with such sale, including, without limitation, any costs associated with or arising out of any required pre-sale repairs, title or license transfer, taxes or third-party commission.

75. **"New Constituent Documents"** means such certificates or articles of incorporation, formation, or conversion, limited liability company agreements, by-laws, or such other applicable formation and governance documents of Reorganized Riverstreet Ventures.  The New Constituent Documents shall be in form and substance reasonably acceptable to the principals of NEWCO Holdings.

76. **"New Equity Interests"** means the equity interests to be issued under the Plan by Riverstreet Ventures to Holders of Allowed Class 5 Claims and NEWCO Holdings as of and upon closing of the Construction Loan.

77. **"NEWCO" or "NEWCO Holdings"** means the limited liability company or other form of entity to be issued the New Equity Interests under the Plan.

78. **"NEWCO Principals"** means the Reorganized Debtor, Holders of Allowed Class 5 Claims and the Construction Lender.

79. **"Payment Plan"** shall mean the payments to the Debtor's Creditors provided in Articles III and IV of this Plan.

80. **"Person"** has the meaning set forth in Section 101(41) of the Bankruptcy Code.

81. **"Petition Date"** means June 23, 2021, the date on which the Debtor filed its voluntary petition.

82. **"Plan"** means this Chapter 11 Plan of Reorganization of the Debtor, including, without limitation, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

83. **"Plan Distributions"** means a payment or distribution made under the Plan to Holders of Allowed Claims or other eligible Entities

84. **"Plan Supplement"** means certain forms of documents and information specified in this Plan.

85. **"Priority Claim"** means a Claim entitled to priority in payment as specified in Sections

507(a)(1)-(10) of the Bankruptcy Code.

86. **"Priority Tax Claim"** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

87. **"Professional Fee Claim"** means a Professional's Claim for compensation or reimbursement of costs and expenses under Sections 327, 328, 330, 331, 503(b) (other than 503(b)(4)) or 1103 for services rendered to the Debtors on and after the Petition Date but before and including the Effective Date.

88. **"Pro Rata"** means, with reference to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such Class.

89. **"Professional"** means any Court-approved professional Person employed by the Debtor or the Unsecured Creditors Committee in the Bankruptcy Cases at any time before the Confirmation Date.

90. **"Property of the Estate"** is defined in Section 541 of the Bankruptcy Code.

91. **"RECL"** means Real Estate Commercial Lending, LLC.

92. **"Rejection Claim"** means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code. Allowed Rejection Claims are classified and as an unsecured claim in the Class of unsecured claims for the counterparty to the rejection claim.

93. **"Rejection Claim Bar Date"** means that date that is ten (10) days after the Confirmation Date.

94. **"Reorganized Debtor" or "Reorganized Riverstreet"** means the Debtor after the Effective Date, or any successor thereto by merger, consolidation or otherwise.

95. **"Restructuring Transactions"** means the transactions described in Article 6.2 of this Plan.

96. **"Retained Causes of Action"** means any Causes of Action specifically or implicitly preserved and retained under this Plan.

97. **"Sale"** shall mean the sale of the assets of the Debtors if the Court does not confirm the Debtor's Payment Plan.

98. **"Schedules"** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Bankruptcy Case, as have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

99. **"Secured Claim"** means any Claim that is secured by a Lien on Collateral.

100.  **"Secured Creditor"** means those Creditors who possess valid and perfected Liens against

any property of the Debtor.

101.     **"Unliquidated Claim"** means any Claim, the amount of liability for which has been not fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to bet estimated.

102.     **"Unsecured Claim"** means any Claim that is not secured by a Lien on Collateral.

103.     **"Voting Class"** means a Class specified as such in Article III of this Plan.